**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TINA LOUISE NUSMAN WILLIS,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 5:25-CV-02533-JDA<br><br>MAGISTRATE JUDGE JENNIFER DOWDELL ARMSTRONG<br><br>**MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

Plaintiff Tina Louise Nusman Willis ("Ms. Nusman Willis") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Social Security disability insurance benefits ("DIB"). The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 8). For the reasons set forth below, the Commissioner's final decision denying Ms. Nusman Willis' application for DIB is AFFIRMED.

## II. PROCEDURAL HISTORY

On February 4, 2022, Ms. Nusman Willis filed her application for DIB, alleging an onset date of February 1, 2017. (Tr. 316). Ms. Nusman Willis' application related to her complex post-traumatic stress disorder (PTSD), major depressive disorder, social anxiety disorder, and fibromyalgia. (Tr. 425).

The Social Security Administration ("SSA") denied Ms. Nusman Willis' application initially and upon reconsideration. (Tr. 104, 125). Ms. Nusman Willis requested a hearing before

an administrative law judge ("ALJ"). (Tr. 165). The ALJ held a hearing on September 7, 2023, at which Ms. Nusman Willis was represented by counsel. (Tr. 37). Ms. Nusman Willis testified, as did an independent vocational expert ("VE"). On September 29, 2023, the ALJ issued a written decision, finding that Ms. Nusman Willis was not disabled. (Tr. 126).

On July 29, 2024, the Appeals Council granted Ms. Nusman Willis' request for review and remanded the case to the ALJ for further proceedings. (Tr. 145). In particular, the Appeals Council instructed the ALJ to enter evidence from Mari Lyn, L.P.P.C. into the record and to give further consideration to whether Ms. Nusman Willis' symptoms were attributable to fibromyalgia and whether her fibromyalgia was a medically determinable impairment. (Tr. 147-48).

Following remand, the ALJ conducted a second hearing on January 6, 2025. (Tr. 70). Ms. Nusman Willis and a VE again testified. On January 22, 2025, the ALJ issued a written decision again finding that Ms. Nusman Willis was not disabled. (Tr. 14). On September 23, 2025, the Appeals Council declined further review. (Tr. 1).

On November 20, 2025, Ms. Nusman Willis filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Nusman Willis asserts the following assignments of error:

(1) The ALJ erroneously failed to comply with the Order of Remand at Step Three of the Sequential Evaluation when he failed to properly evaluate Plaintiff's fibromyalgia.

(2) The ALJ erroneously failed to properly support and/or address consistency with his conclusions regarding the opinion of the treating source.

(3) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF No. 7, PageID # 2289).

## III. BACKGROUND

### A. Personal, Educational, and Vocational Experience

Ms. Nusman Willis was born in 1969 and was 54 years old on her date last insured. (Tr. 316). She has one child. (Tr. 317). Ms. Nusman Willis has a college degree. (Tr. 426). She does not have any prior relevant work experience. (Tr. 29).

### B. Relevant Hearing Testimony

#### *1. Ms. Nusman Willis' Testimony*

At the September 7, 2023 hearing, Ms. Nusman Willis testified that she worked part time at the Kent State performing arts center and as an editor of secret shopper forms. (Tr. 43-44). She testified that she is unable to work full time because her muscles get tired and prevent her from carrying things and walking long distances. (Tr. 50-51). She also testified that she tried working a less physically demanding job at a pet store, but that her pain and anxiety were too severe and caused her to make mistakes. (Tr. 51). Ms. Nusman Willis further testified that her anxiety makes it difficult for her to leave the house and that she typically needs her case manager with her when she goes to the grocery store. (Tr. 52). She also testified that she has problems with her energy level and motivation that make it difficult for her to perform household chores. (Tr. 60-61).

Ms. Nusman Willis testified that she experiences daily pain in her back, shoulders, neck, hips, and hands. (Tr. 53). She takes an anti-inflammatory and a muscle relaxer, which take the edge off but do not provide significant relief. *Id*. Ms. Nusman Willis also testified that she uses medicinal marijuana throughout the day. (Tr. 57-58). She testified that she had carpal tunnel surgery on her right wrist, after which she no longer has problems using her right arm. (Tr. 53-54). However, Ms. Nusman Willis also testified that the strength has decreased in her left hand and that she has trouble picking up small items. (Tr. 60).

At the January 6, 2025 hearing, Ms. Nusman Willis testified that her fibromyalgia causes

pain from her head to her buttocks and sometimes shoots down her leg. (Tr. 80-81). She also testified that her pain differs in intensity but is typically a four out of ten when she wakes up and fluctuates from there. (Tr. 81). She further testified that she takes Flexeril and Diclofenac for the pain. *Id*. Ms. Nusman Willis testified that there are occasions where she misses work as a stagehand or leaves work early due to the pain. (Tr. 82-83). She also testified that her physical condition had worsened since the prior hearing and that she struggles to walk more than 30 yards before she needs to sit down. (Tr. 89).

Ms. Nusman Willis also testified that her mental health is improving overall but continues to fluctuate. (Tr. 89). She testified that there are days when she has more difficulty leaving the house than normal and that she continues to have panic attacks. (Tr. 85-86, 88). She also testified that she sometimes refuses to do jobs or leaves them early because of psychological symptoms. (Tr. 87).

With respect to daily activities, Ms. Nusman Willis testified that she crochets and knits, though she needs to take breaks every five to twenty minutes. (Tr. 91-92, 96). She also testified that she does not clean her house and that a friend comes over on occasion and does it for her. (Tr. 93). She further testified that she does not do any shopping if she can avoid it, but that if she needs go to the grocery store, she will take Ativan and go with her case manager. (Tr. 94). Ms. Nusman Willis further testified that she cannot drive for more than three hours before needing a break due to shooting pain down her left leg. (Tr. 95).

*2.* ***Vocational Expert's Testimony***

At the second hearing, the ALJ asked the VE to consider a hypothetical individual with Ms. Nusman Willis' age and education who was limited to light work and could occasionally be exposed to unprotected heights, moving mechanical parts, and operating a motor vehicle; was limited to simple instructions and work related decisions; could not perform work at a production

rate pace; could interact occasionally with others; and could handle occasional changes in a routine work setting. (Tr. 98). The VE testified that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including work as an office cleaner, food service worker, and a marker. (Tr. 98-99). The VE further testified that it would be work preclusive if the hypothetical individual required one additional ten-minute break every hour. (Tr. 99). In response to a question from Ms. Nusman Willis' counsel, the VE also testified that it would be work preclusive if the hypothetical individual would be absent one day per week or off-task 50 percent of the workday. (Tr. 101-02).

### C. Relevant Opinion Evidence

#### *1. State Agency Medical Consultants*

On June 16, 2022, Mehr Siddiqui, M.D., a state agency medical consultant, opined that Ms. Nusman Willis had only nonsevere physical impairments. (Tr. 108-09). On November 6, 2022, Steve McKee, M.D., concurred with Dr. Siddiqui's opinion on reconsideration. (Tr. 118).

The ALJ found that the opinions of the state agency medical consultants were not persuasive because the evidence showed that Ms. Nusman Willis had severe physical impairments. (Tr. 26-27).

#### *2. State Agency Psychologists*

On May 10, 2022, David Dietz, PhD, a state agency psychologist, opined that Ms. Nusman Willis had moderate limitations in her ability to perform activities within a schedule, maintain attendance, and be punctual; work in coordination with or proximity to others; complete a normal workday and workweek; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; and respond appropriately to changes in the work setting. (Tr. 111-12). Dr. Dietz also opined that Ms. Nusman Willis was capable of performing tasks that were no more than moderately complex and routine in settings where changes were infrequent and could be explained over time. (Tr. 112). On

October 14, 2022, Irma Johnston, PsyD, concurred with Dr. Dietz's opinion on reconsideration. (Tr. 122).

The ALJ found that the opinions of the state agency psychologists were partially persuasive but that they overstated Ms. Nusman Willis' cognitive capacity and social limitations. (Tr. 28).

***3. Mari Lyn, LPCC***

On August 20, 2023, Ms. Lyn, Ms. Nusman Willis' therapist, completed a mental impairment questionnaire in connection with Ms. Nusman Willis' disability claim. (Tr. 1470). Ms. Lyn opined that Ms. Nusman Willis experienced frequent dissociation and panic attacks and would require lifetime treatment. *Id*. Ms. Lyn also opined that Ms. Nusman Willis was "unable to meet competitive standards" in her ability to complete a normal workday and workweek, perform at a consistent pace without unreasonable rest periods, understand and remember detailed instructions, and interact appropriately with the general public. (Tr. 1470-71). Ms. Lyn further opined that Ms. Nusman Willis was "seriously limited but not precluded" in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, manage attendance and punctuality, understand and remember very short and simple instructions, accept instructions and respond appropriately to criticism, get along with coworkers, and respond appropriately to changes in the work setting. *Id*. Ms. Lyn also opined that Ms. Nusman Willis was "limited buy satisfactory" in her ability to carry out short and simple instructions, sustain an ordinary routine, work in coordination with or proximity to others, remember locations and work-like procedures, ask simple questions or request assistance, maintain socially appropriate behavior, be aware of normal hazards and take precautions, and set realistic goals. *Id*. Finally, Ms. Lyn opined that Ms. Nusman Willis would be absent from work four days per week and would be off task 50 percent of the time. (Tr. 1471).

The ALJ found that Ms. Lyn's opinion was not persuasive because it was only minimally

consistent with and supported by the record as a whole. (Tr. 28).[1]

## D. Relevant Medical Evidence

### *1. Physical Impairments*

Ms. Nusman Willis had an x-ray of her cervical spine on June 21, 2016, which showed mild degenerative changes at C6-7. (Tr. 697). A lumbar spine x-ray from December 28, 2018 was normal. (Tr. 622). At a May 20, 2019 well woman exam, Ms. Nusman Willis said that she felt well with no complaints. (Tr. 649). A November 15, 2019 x-ray of her thoracic spine showed no compression deformity or significant listhesis. (Tr. 619).

On October 9, 2019, Ms. Nusman Willis went to the emergency room, complaining of back pain and back spasms. (Tr. 654). She was uncooperative with an examination of the lower extremities. (Tr. 655). It was recommended that she continue to take prescribed medications for chronic symptoms. *Id*.

On January 21, 2020, Ms. Nusman Willis reported experiencing migraines that were not relieved by over-the-counter medication or other comfort measures. (Tr. 825). She went to the emergency room on August 18, 2020, complaining of a migraine. (Tr. 640). She said that the headache had lasted for a week with some vomiting, and that she had a long history of migraines. *Id*. A CT scan was unremarkable, and she was given medication and discharged to her home. (Tr. 642).

On February 3, 2021, Ms. Nusman Willis saw her primary care provider after experiencing a headache for two weeks along with pain in her lower back. (Tr. 798). She was prescribed medication. *Id*. On December 13, 2021, Ms. Nusman Willis complained of back, shoulder, neck, and chest pain. (Tr. 781). She said that she had been working on a new piece of machinery at work,

[1] Ms. Nusman Willis' counselor, Kristina Hatcher, LPCC, also completed a questionnaire on October 24, 2024 and wrote a letter on December 23, 2024. (Tr. 1473, 2264). The ALJ found that Ms. Hatcher's opinions were irrelevant and unpersuasive because Ms. Hatcher first met Ms. Nusman Willis months after her date last insured. (Tr. 28). Ms. Nusman Willis does not challenge that finding in this proceeding.

and that she was unsure if the machine had caused her pain. *Id*. An examination was normal. *Id*. She was prescribed Cyclobenzaprine and Nabumetone. *Id*.

On April 20, 2022, Ms. Nusman Willis went to the emergency room after experiencing wrist pain for a week, which she rated as a seven out of ten. (Tr. 744). She said that she did not recall any recent injury, but that she had been working as a crew member on a play. *Id*. She reported increased pain with flexion and said that the pain would sometimes radiate to her forearm and her thumb. *Id*. She was able to squeeze her hand without difficulty and did not have any loss of sensation or motion. *Id*. An x-ray of her right wrist was normal. (Tr. 1282). She was given a splint and instructed to take Tylenol or Motion and to ice the injury to reduce pain. (Tr. 749).

On May 11, 2022, Ms. Nusman Willis went to East Ohio Orthopedics, complaining of right wrist pain. (Tr. 924). She said that she had experienced pain for two years following a car accident and that she had been experiencing a flare-up for approximately a month. *Id*. She rated the pain as a five out of ten with certain movements, but said it was better when she avoided certain activities and wore a brace. *Id*. An MRI of her right wrist showed minimal degenerative change, but no findings to explain her symptoms. (Tr. 921).

Ms. Nusman Willis had a follow-up visit at East Ohio Orthopedics on June 8, 2022. (Tr. 929). She reported mild improvement with physical therapy but said that she continued to have pain and weakness in her right wrist. *Id*. On examination, she displayed tenderness in her wrist and 4/5 grip strength. (Tr. 930).

Ms. Nusman Willis also attended 11 occupational therapy sessions for pain, decreased strength, and decreased range of motion. (Tr. 944, 947). Her discharge summary from July 29, 2022 noted that Ms. Nusman Willis reported no improvement in her pain, some improvement in grip strength, and improved pinch strength. (Tr. 947). A nerve study on October 21, 2022 revealed mild bilateral carpal tunnel syndrome and mild ulnar neuropathy across the right elbow. (Tr. 1232).

Ms. Nusman Willis underwent carpal tunnel surgery on January 17, 2023. (Tr. 1418). On May 30, 2023, she reported that her wrist pain had improved and that she was doing well with no complaints or concerns. (Tr. 1411).

On March 3, 2023, Ms. Nusman Willis underwent a nerve study of her lower extremities after she reported pain and paresthesia. (Tr. 1079-81), The nerve study was normal, and there was no evidence of peripheral polyneuropathy, bilateral lumbosacral radiculopathy, or myopathy. (Tr. 1081).

Ms. Nusman Willis went to the emergency room again on March 14, 2023, complaining of right-sided back pain that radiated down to her right leg. (Tr. 1227). She reported increased pain with walking and palpitation. *Id*. She was given Toradol, Flexeril, and a lidocaine patch and discharged in stable condition. (Tr. 1228).

On March 15, 2023, Ms. Nusman Willis underwent an initial evaluation with Mark J. Pellegrino, M.D. for chronic widespread pain. (Tr. 1070). Dr. Pellegrino noted that Ms. Nusman Willis was diagnosed with fibromyalgia in 2005 and had experienced chronic widespread pain ever since. *Id*. Ms. Nusman Willis also reported increased lower back pain, primarily on her right side. *Id*. She said that she could not sit still because of the pain. *Id*. On examination, Ms. Nusman Willis jerked frequently due to pain and had pain to palpitation of her lumbar spine. (Tr. 1071). She was positive for 18 out of 18 fibromyalgia trigger points. (Tr. 1071-72). She was diagnosed with sciatica of the right side, fibromyalgia, and sacroiliitis. (Tr. 1072). Dr. Pellegrino noted that Ms. Nusman Willis' back pain appeared unrelated to her fibromyalgia. *Id.* A March 24, 2023 x-ray of her lumbar spine showed no acute osseous abnormality. (Tr. 1219).

On April 6, 2023, Ms. Nusman Willis reported experiencing muscle weakness and said that her legs gave out. (Tr. 1076-77). On August 10, 2023, she requested a handicap placard due to pain and shortness of breath while walking. (Tr. 1167). During this period, Ms. Nusman Willis

also received care, including acupuncture, from Allium Naturopathic Health. (Tr. 1236-37, 1734, 1242). She reported that acupuncture helped with her pain. (Tr. 1242).

### *2. Mental Health Impairments*

On January 19, 2018, Ms. Nusman Willis went to the emergency room, saying that she was afraid she might hurt herself. (Tr. 686). She requested that she be placed in the crisis unit until the following Monday, when she could see her psychiatrist, counselor, and case manager. *Id*. Ms. Nusman Willis was occasionally tearful but able to give answers in a straightforward fashion and did not display any evidence of psychosis. (Tr. 687).

On April 16, 2018, Ms. Nusman Willis presented to Coleman for a diagnostic assessment. (Tr. 1527). Ms. Nusman Willis reported that she was hospitalized for 16 days in January after she experienced suicidal ideations and tried to hang herself in the hospital. *Id*. She also reported that she was in a day program but that the program would not prescribe her Ativan, which was the only thing that helped her. *Id*. Ms. Nusman Willis also reported approximately six admissions for suicidal ideation since 2016. (Tr. 1547). On examination, she displayed an average demeanor with clear speech, a euthymic mood, full affect, logical thought processes, unremarkable thought content, and poor insight and judgment. (Tr. 1538-39). She was assessed as having a medium level of risk, and it was noted that she engaged in cutting and bulimic behavior. (Tr. 1539). She was diagnosed with borderline personality disorder, severe bulimia nervosa, PTSD, severe major depressive disorder, cannabis use disorder, and moderate opioid use disorder in sustained remission. (Tr. 1545-46).

At an April 26, 2018 follow-up session, Ms. Nusman Willis and her psychiatrist discussed decreasing her medications. (Tr. 1554). She reported that her depression was a seven out of ten and her anxiety was an eight out of ten. *Id*. Ms. Nusman Willis continued to attend therapy thereafter. On May 24, 2018, she reported that she was feeling good and working at a theater. (Tr.

1561). On June 6, 2019, she reported that her depression was a three out of ten and her anxiety was a four out of ten. (Tr. 1624). On July 19, 2018, she reported that she was a bit more depressed and anxious but that her mood had improved. (Tr. 1575). She rated her depression as a three out of ten and her anxiety as a five out of ten. *Id*. On November 11, 2019, she reported that she was doing well and had not cut herself in four months. (Tr. 1652). She rated her depression and anxiety as a two out of ten. *Id*. A mental examination was unremarkable. (Tr. 1653-55).

At a July 21, 2020 session at Springvale Health Centers, Ms. Nusman Willis reported that she was doing well and had just returned from visiting her father in Saint Louis. (Tr. 829). On examination, she was anxious and reactive, with intact comprehension, logical thoughts, fair insight, and good judgment and recall. (Tr. 830). On November 3, 2020, Ms. Nusman Willis reported that she had been doing well and enjoying her life. (Tr. 810). It was noted that Ms. Nusman Willis had experienced mild depression for more than a year. *Id*. On examination, she was anxious and reactive, but displayed a pleasant mood, intact comprehension, logical thoughts, and good insight, judgment, and recall. (Tr. 811).

Ms. Nusman Willis underwent an initial assessment at the Counseling Center of Wayne and Holmes Counties on January 13, 2021. (Tr. 540). She reported fewer symptoms since she began medication and therapy but that she sometimes experienced anxiety and panic attacks. *Id*. She also reported auditory hallucinations, flashbacks, nightmares, intrusive thoughts, and occasional binging and purging. *Id*. A mental health examination was unremarkable. (Tr. 541).

On April 28, 2021, Ms. Nusman Willis reported that she was struggling with her appetite but that she had not purged in some time. (Tr. 556). On examination, she displayed a euthymic mood, appropriate affect, coherent speech, appropriate thought content, and fair insight, judgment, and memory. (Tr. 557-58). On June 23, 2021, Ms. Nusman Willis reported that she was working at the theater again and had obtained a Reiki certification. (Tr. 562-63). She rated her depression

as a two out of ten and her anxiety as a five or six out of ten. (Tr. 563). On August 18, 2021, Ms. Nusman Willis reported that her depression had worsened. (Tr. 569). On November 16, 2021, she said that her job at the theater was going well and that she was hoping to start a new job at a pet store. (Tr. 583). She continued to struggle with eating but rated her depression and anxiety as a one-and-a-half out of ten. *Id*.

On March 9, 2022, Ms. Nusman Willis reported that the prior month had been rough and that she was struggling. (Tr. 601). She said that she stopped working at the pet store and that her anger and anxiety had increased. *Id*. She also reported struggling with thoughts of cutting. *Id*. She rated her depression as a six out of ten, her anxiety as an eight out of ten, and her thoughts of self-harm as a nine out of ten. *Id*. Ms. Nusman Willis did not believe she needed a hospital stay at that time. *Id*.

Ms. Nusman Willis was admitted to Sunrise Vista Behavioral Health on July 30, 2022. (Tr. 961). She reported experiencing a number of symptoms over the previous two weeks, including depressive feelings, irritability, hopelessness, helplessness, poor sleep, racing thoughts, severe anxiety, and panic attacks. *Id*. She also reported binge eating, restrictive eating, and cutting herself. *Id*. She was discharged on August 4, 2022 in stable condition. (Tr. 961-62).

On August 8, 2022, Ms. Nusman Willis said that her anxiety had come down and that she had been sleeping better. (Tr. 1018). On examination, she was mildly depressed and anxious, with appropriate speech, logical thought processes, intact memory, and good insight and judgment. (Tr. 1019-20). She had no current thoughts of harming herself or others. (Tr. 1020).

On September 29, 2022, Ms. Nusman Willis said that her depression was worse and that her self-harm urges had increased. (Tr. 1140). At a January 1, 2023 session, she reported that she was continuing to work and was doing art therapy. (Tr. 1128). On May 15, 2023, Ms. Nusman Willis was struggling with mood and working on trying to take care of financial obligations. (Tr.

1103). On June 19, 2023, she reported that her mood had been stable, rating her depression as a three out of ten and her anxiety as a four out of ten. (Tr. 1096). She also said that she went kayaking and enjoyed it very much. *Id*.

## IV. THE ALJ'S DECISION

The ALJ first determined that Ms. Nusman Willis last met the insured status requirements of the Social Security Act on September 30, 2023. (Tr. 19). The ALJ next determined that Ms. Nusman Willis had not engaged in substantial gainful activity between February 1, 2017, the alleged onset date, and her date last insured. *Id*. The ALJ further determined that Ms. Nusman Willis had the following severe impairments: fibromyalgia, nephrotic syndrome, major depressive disorder, anxiety, and post-traumatic stress disorder. (Tr. 20). However, the ALJ determined that none of Ms. Nusman Willis' severe impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I. *Id*.

The ALJ next determined that Ms. Nusman Willis had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) except that the claimant may occasionally be exposed to unprotected heights, moving mechanical parts, and operation of a motor vehicle; the claimant is able to understand, remember, and carry out simple instructions and to make no more than simple, work-related decisions, if conducted in a work setting free of production-rate pace, which setting requires no more than occasional interaction with others, which setting is routine, in that it contemplates occasional changes.

(Tr. 22-23).

The ALJ further determined that Ms. Nusman Willis had no past relevant work. (Tr. 29). The ALJ determined, however, that jobs existed in significant numbers in the national economy that Ms. Nusman Willis could perform, including work as an office cleaner, food service worker, or marker. *Id*. Accordingly, the ALJ found that Ms. Nusman Willis was not disabled. (Tr. 30).

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. <u>Standard for Disability</u>**

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis

despite limitations from her impairments. 20 C.F.R. § 404.1520(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g) and 404.1560(c). *See Abbott*, 905 F.2d at 923.

## C. <u>Analysis</u>

### *1. The ALJ's Evaluation of Ms. Nusman Willis' Fibromyalgia*

Ms. Nusman Willis first argues that the ALJ erred in evaluating her fibromyalgia under Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (July 25, 2012). SSR 12-2p provides that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations" that prevent a person from performing a full range of unskilled work. *Id*. at *6. SSR 12-2p further provides that people with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." *Id*.

In addition, SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. It provides that, once the ALJ determines that a claimant has a medically determinable impairment of fibromyalgia, the ALJ must proceed to evaluate fibromyalgia under the traditional five-step review process. *Id*. at *5. In doing so, the ALJ must also evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. *Id*. First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id*. Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id*. SSR 12-2p also provides that, given the distinct characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever

possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id*. at *6.

Importantly, although "the same factors are applied to fibromyalgia as to any [medically determinable impairment], caselaw demonstrates that [t]he nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis." *James v. Comm'r of Soc. Sec*., No. 1:22-CV-1915, 2023 WL 4172932, at *14 (N.D. Ohio June 5, 2023) (quotations omitted). That is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 (6th Cir. 2007)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Id*. (quoting *Preston v. Sec'y of Health & Human Servs*., 854 F.2d 815, 820 (6th Cir. 1988)). Instead of focusing on indications like muscle strength and range of motion, the process of diagnosing fibromyalgia "includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id*. at 244. As the Sixth Circuit has stated, "in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Id*. at 245.

Ms. Nusman Willis first argues that the ALJ erred in evaluating her fibromyalgia at Step Three of the sequential evaluation process. At Step Three, the ALJ must consider whether a claimant's severe impairment meets or medically equals the requirement for a listing. 20 C.F.R. § 404.1520(d). "An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds v. Comm'r of Soc. Sec*., 424 F. Appx. 411, 415 (6th. Cir. 2011). If the impairment meets or equals a listing and satisfies the durational requirement, the ALJ must find that the claimant is disabled. *Smith-Johnson v. Comm'r of Soc.*

*Sec.*, 579 F. Appx. 426, 431 (6th Cir. 2014). However, the claimant must exhibit all elements of the listing; it is not sufficient that a claimant come close to meeting the requirements of a listing. *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). It is the claimant's burden at Step Three to prove that an impairment medically equals a listing. *Lusk v. Comm'r of Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004). To meet that burden, a claimant must "present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

There is no listing for fibromyalgia, and Ms. Nusman Willis' fibromyalgia thus cannot meet a listing. Instead, Ms. Nusman Willis must show that her fibromyalgia medically equals a listing, such as Listing 14.09D, which SSR 12-2p references. *See* SSR 12-2p, 2012 WL 3104869, at *6 ("[F]ibromyalgia] cannot meet a listing in appendix 1 because [fibromyalgia] is not a listed impairment. At step 3, therefore, we determine whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment").

SSR 17-2p provides that an ALJ may find that an impairment medically equals a listing only if the record contains supporting findings from a state agency consultant or a medical expert. 2017 WL 3928306, at *3 (Mar. 27, 2017). Here, the ALJ referenced Listing 14.09 in his decision, but concluded that he was "constrained against making an 'equals' finding" because there was "no independent medical expert in attendance during the hearing." (Tr. 21). Ms. Nusman Willis argues that the ALJ's reasoning was deficient because the ALJ had the sole authority to determine whether to call an independent medical expert and cannot rely on his own failure to do so as the basis for his medical equivalency determination.

"An ALJ is permitted, but not required, to call a medical expert." *Cline v. Comm'r of Soc. Sec.*, No. 1:23-cv-01087, 2024 WL 860627, at *2 (N.D. Ohio Feb. 29, 2024) (citing *Simpson v.*

*Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009)). Indeed, "if the ALJ 'believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert evidence, and in fact need not even 'articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment.'" *Barkhauer v. Comm'r of Soc. Sec. Admin.*, No. 5:24-CV-00560, 2025 WL 1115618, at *22 (N.D. Ohio Apr. 15, 2025) (quoting SSR 17-2p, 2017 WL 3928306, at *4). SSR 17-2p further provides that "a statement that the individual's impairment does not medically equal a listed impairment constitutes sufficient articulation for this finding." *Id.*

Ms. Nusman Willis is correct that the ALJ's analysis of whether her fibromyalgia medically equaled Listing 14.09D is potentially problematic. Rather than concluding that a medical expert was unnecessary because Ms. Nusman Willis did not meet the listing, the ALJ felt "constrained" against making an equivalency finding because no medical expert testified. (Tr. 21). To the extent the ALJ believed the lack of a medical expert precluded him from making a finding of medical equivalency, the Court agrees with Ms. Nusman Willis that the ALJ could have simply called that expert.

While the ALJ's statement is concerning in a vacuum, however, a reviewing court reads the ALJ's decision as a whole to determine whether the ALJ adequately addressed medical equivalency elsewhere. *See Lybarger v. Comm'r of Soc. Sec.*, No. 3:24-cv-1013, 2024 WL 5134290, at *15 (N.D. Ohio Dec. 17, 2024), *report and recommendation adopted*, 2025 WL 959463 (N.D. Ohio Mar. 31, 2025) ("Legal authority instructs that the balance of the ALJ's decision must supply the rationale for the ALJ's medical equivalence finding."). In formulating Ms. Nusman Willis' RFC, the ALJ acknowledged her fibromyalgia but found that the evidence as a whole was "not supportive of the contention that the existence of this impairment would be

preclusive of all types of work." (Tr. 24). In particular, the ALJ noted that Ms. Nusman Willis had only received intermittent treatment through prescription medicines, largely restricted to muscle relaxers rather than nerve conduction suppressants. *Id*. The ALJ also noted that Ms. Nusman Willis began an acupuncture regimen in May 2023, which she reported was very helpful. *Id*. Finally, the ALJ noted that, "[a]s would be expected," clinical examinations typically described preserved strength or non-focal neurological examinations, while diagnostic studies were unrevealing and lent no support to her reported symptoms. *Id*.

Elsewhere, the ALJ discussed Ms. Nusman Willis' activities of daily living and social functioning. The ALJ noted that Ms. Nusman Willis maintained an independent household while serving as a single parent for her son. (Tr. 25). The ALJ also noted that she attended to hygiene and grooming with some difficulties in motivation, while also attending to typical indoor chores and some outdoor chores. *Id*. In addition, the ALJ noted that Ms. Nusman Willis walked, drove, crafted, played games, hiked, kayaked, traveled out of state, and worked regularly during the relevant period, sometimes on a full-time basis. (Tr. 25-26).

In sum, the ALJ's RFC discussion provided additional analysis of Ms. Nusman Willis' fibromyalgia and her daily functioning. That discussion constitutes substantial evidence supporting the ALJ's determination that her fibromyalgia did not medically equal Listing 14.09D or another listing, even if the ALJ's statement at Step Three was arguably insufficient. Ms. Nusman Willis' argument that the ALJ erred at Step Three with respect to her fibromyalgia is not well-taken.

Ms. Nusman Willis also argues that the ALJ erred in his analysis of her fibromyalgia at the remaining steps of the sequential evaluation process. In support, she cites to evidence documenting her diagnosis of fibromyalgia. However, the ALJ agreed that Ms. Nusman Willis' fibromyalgia was a severe impairment, stating that her diagnosis dated back to 2005 and that it would be

"inequitable to demand of the claimant, the extensive diagnostic and 'ruling out' procedures contemplated by Social Security Ruling 12-2p." (Tr. 24).

Ms. Nusman Willis also cites to evidence that she believes should have led the ALJ to incorporate greater restrictions into her RFC as a result of her fibromyalgia, including records showing that she complained of fatigue, decreased appetite, headaches, and widespread pain. She also cites to her own testimony regarding her pain and limitations. But "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Here, as discussed above, the ALJ expressly analyzed the limitations that Ms. Nusman Willis' fibromyalgia imposed on her ability to work, and substantial evidence supports the ALJ's conclusion. While Ms. Nusman Willis may be correct that other evidence in the record could have supported a more restrictive RFC, that is not the relevant standard. Accordingly, her first assignment of error is without merit.[2]

***2. The ALJ's Analysis of the Opinion Evidence***

Ms. Nusman Willis next argues that the ALJ erred in evaluating the opinion of Ms. Lyn, who opined that Ms. Nusman Willis had significant limitations in a number of functional categories and would be absent from work four days per week and would be off task 50 percent

[2] Ms. Nusman Willis briefly argues that the ALJ erred in stating that her fibromyalgia was not "preclusive of all types of work" (Tr. 24) because her age, education, and past relevant work mean that she would be disabled if she were limited to the sedentary level of exertion. However, the ALJ found that Ms. Nusman Willis could perform work at the light exertional level. (Tr. 22-23). Substantial evidence supports the ALJ's determination, and Ms. Nusman Willis' argument to the contrary is unavailing.

of the time. (Tr. 1470-71).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported his conclusions with substantial evidence within his decision, the Court will not disturb his decision." *Njegovan v. Comm'r of Soc. Sec. Admin*., No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

The ALJ addressed Ms. Lyn's opinion as follows:

> The claimant's counselor, Mari Lyn, LPCC, indicated that the claimant would have mild-to-marked limitations in her ability to understand,

> remember, and carry out instructions, to interact with others, and to concentrate, persist, and maintain pace, and would have mild-to-moderate limitations in her ability to adapt to the stressors of day-to-day work, that she would be absent four days per week and off-task fifty percent of the time. Ms. Lyn treated the claimant over an extensive period, within [at least] two separate practices: Total Health and Wellness Center and Golden Wheel Wholistic [sic.] services. She is reporting within the bounds of her professional certifications. However, there is no evidence submitted from Ms. Lyn. The only objective evidence in the record has been described in digest form in the analysis of the opinions of Drs. Dietz and Johnston, above. By comparison to the objective evidence, this opinion overstates the claimant's limitations in three of the four psychologically-based, work-related areas of function. As regards absenteeism and off-task behavior, I note the claimant's following her psychiatric provider from one practice to the next (23F/169), (1F/8), her engagement in psychiatric services throughout, and her faithful attendance at those sessions. This opinion is only minimally consistent with, and supported by, the overall evidence of record and is not persuasive.

(Tr. 28).

The ALJ's analysis properly addresses both the supportability and consistency factors. The ALJ addressed supportability by noting that Ms. Lyn did not submit any evidence in support of her opinion. *Solomon v. Comm'r of Soc. Sec.*, No. 5:25-cv-01977, 2026 WL 1336228, at *10 (N.D. Ohio May 13, 2026) (holding that ALJ adequately addressed supportability by "explicitly discuss[ing] the lack of objective medical records and explanations that [physician] considered in forming his opinion"); *Eberhart v. Comm'r of Soc. Sec.*, No. 3:25-CV-02190-JRK, 2026 WL 2715938, at *6 (N.D. Ohio Sept. 15, 2026) (report and recommendation) (holding that ALJ properly evaluated supportability factor by stating that psychologists did not support findings with explanation or analysis describing the relevant evidence).

The ALJ also adequately addressed consistency by noting that Ms. Lyn's opinion regarding absenteeism and off-task behavior was inconsistent with the objective evidence that the state agency psychologists relied on, as well as evidence that Ms. Nusman Willis consistently engaged in psychiatric services throughout the relevant period and faithfully attended those sessions. *See*

*Merrell v. Comm'r of Soc. Sec.*, No. 1:20-cv-769, 2021 WL 1222667, at *7 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021) (holding that ALJ's decision to discount weight given to opinion from treating physician was supported by substantial evidence where opinion was inconsistent with evidence in the record); *Creter v. Saul*, No. 1:20-cv-00840, 2021 WL 809323, at *11 (N.D. Ohio Mar. 3, 2021) (holding that ALJ did not err where ALJ specifically cited treatment records ALJ believed were inconsistent with treating physician's opinion and explained why).

Ms. Nusman Willis cites to evidence that she believes is consistent with Ms. Lyn's opinion and that should have led the ALJ to adopt the opinion. As discussed above, however, the Court cannot overturn the ALJ's decision if it is supported by substantial evidence, even if other evidence would have supported a different conclusion. *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's evaluation of Ms. Lyn's opinion, and the Court will not second-guess the ALJ's decision merely because other evidence may have supported a different conclusion.

Ms. Nusman Willis also argues that the ALJ either misstated or overlooked evidence in the record. For example, she criticizes the ALJ for finding that she was able to function in public places, including stores, noting that she testified she needed her case manager's assistance to go the store. However, the ALJ cited to at least one record in which Ms. Nusman Willis told her naturopath that she went to the grocery store by herself for the first time in a while. (Tr. 1242). Similarly, while Ms. Nusman Willis asserts that the ALJ failed to address her two hospitalizations for mental health issues, the ALJ expressly discussed Ms. Nusman Willis' hospitalization in July and August 2022. (Tr. 21-22).

It is true that the ALJ did not expressly discuss Ms. Nusman Willis' 2018 hospitalization, and the Court agrees with Ms. Nusman Willis that the ALJ's omission is troubling, particularly given that the admission occurred after she attempted to hang herself. (Tr. 1527). As the

Commissioner correctly argues, however, the ALJ is not required to discuss every piece of evidence, so long as the decision makes clear that the ALJ considered the evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand"). Reviewing the decision as a whole, it is clear that the ALJ thoroughly considered the relevant evidence regarding Ms. Nusman Willis' mental health impairments. As a result, the ALJ's failure to expressly discuss the 2018 hospitalization does not invalidate the ALJ's evaluation of Ms. Lyn's opinion and does not warrant remand. Ms. Nusman Willis' second assignment of error is without merit.

***3. SSR 16-3p***

Finally, Ms. Nusman Willis argues in her third ground for relief that the ALJ erred because the ALJ did not credit her subjective statements regarding her impairments which, she claims, are supported by the evidence as a whole.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id*. If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id*. at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical

evidence and the other evidence." *Id*. at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id*. at *7-8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec. Admin*., No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones*, 336 F.3d at 476 ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers,* 486 F.3d at 249.

The ALJ's evaluation of Ms. Nusman Willis' subjective complaints takes on particular importance in this case given that fibromyalgia is one of her severe impairments. Because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.*, No. 1:21-CV-

01309, 2022 WL 3567412, at *10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022) (citing *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003)); *see also Butler v. Comm'r of Soc. Sec.*, No. 5:16 CV 2998, 2018 WL 1377856, at *11 (N.D. Ohio Mar. 19, 2018) ("An ALJ's credibility analysis is especially important in cases of fibromyalgia due to the nature of the disease."). However, Ms. Nusman Willis does not identify any errors or deficiencies in the ALJ's analysis of her subjective complaints. Instead, she cites to evidence in the record that she believes was consistent with her testimony and argues that the ALJ should have given her testimony greater weight. As the Commissioner correctly responds, Ms. Nusman Willis' argument is an invitation for the Court to reweigh the evidence, which the Court cannot do. *Jones*, 336 F.3d at 477. The ALJ thus did not err in evaluating Ms. Nusman Willis' subjective statements under SSR 16-3p.

## VI. CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Commissioner's final decision denying Ms. Nusman Willis' application for Social Security disability insurance benefits.

**IT IS SO ORDERED.**

Dated: September 24, 2026

*<u>/s Jennifer Dowdell Armstrong</u>*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge